(R.D. 11200)

E. W. GOLDSTEIN CO., INC. v. UNITED STATES

Entry No. 790326.

(Decided June 28, 1966)

*Siegel, Mandell & Davidson* (*Murray Sklaroff* of counsel) for the plaintiff.
*John W. Douglas,* Assistant Attorney General (*Glenn E. Harris,* trial attorney), for the defendant.

OLIVER, Judge: The merchandise involved in this appeal to reappraisement consists of certain anodized aluminum chain, exported from West Germany on August 13, 1960, and identified on the commercial invoice as SP 60 flat anodized aluminum silver chain. The chain is used in the manufacture of jewelry. It was appraised on the basis of export value, as defined in section 402(b), Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, at $3.01 per 100 meters, net packed. Plaintiff accepts the basis of appraisement but claims that the proper dutiable value is only $2.75 per 100 meters, net packed.

The parties stipulated that August 1960 represented the date of exportation for this merchandise (R. 5).

Plaintiff introduced into evidence both the prime and supplemental affidavits of Werner Fink, manager of Walter Fischer, the German manufacturer of the imported articles. They were received in evidence as plaintiff's exhibit 1 (R. 3). The affiant states, therein, that Walter Fischer is a manufacturer of chain and imitation jewelry and in such capacity it produces a type of anodized aluminum chain, silver in color, which is identified on the invoices of sales to United States purchasers as "SP 60 chain or 06/33." [1] The affidavit contains a tabulation of these sales during most of 1960. One part lists individual sales, from February to November, made to the importer, E. W. Gold-

[1] Both methods of identification appear on the commercial invoice involved in this appeal.

stein Co., Inc. Another part contains individual sales, from January to December, said to be made to other purchasers in the United States. Beneath this tabulation there is the statement that the merchandise was freely offered to all United States purchasers at wholesale prices, with no restrictions as to use or disposition.

Page 3 of the prime affidavit deals with the differences in production and cost between this anodized aluminum silver chain and the same chain in gold color. While both chains are produced by an electro-chemical process, the silver chain, being the color of the aluminum, does not require the addition of coloring ingredients. The affiant states that, in the production of the silver color chain, only one shade of silver is possible and, therefore, color control between one production lot and another is unnecessary. For this reason, silver color chain can be produced under day or night conditions all year round. In the production of gold color chain, however, chemical coloring ingredients are added and several shades may occur. For purposes of color control, natural as opposed to artificial light is required. Production is, therefore, possible only during daylight hours and this time is further curtailed during the fall and winter months. Cost factors of production are claimed to vary for this reason.

The supplemental affidavit of Mr. Fink contains exhibits A and B which represent samples of the silver and gold colored aluminum chain discussed in the prime affidavit.

These affidavits were received in evidence without objection and at this point plaintiff rested its case.

The Government called as its witness Mr. Max Greenberg, a customs examiner in the United States Appraiser's Office in New York. Mr. Greenberg's line of merchandise included jewelry and parts. He testified in substance as follows: That, in the course of his official duties, he had examined the entry of merchandise presently before the court in this appeal; that, from his personal examination of invoices of importations from the Walter Fischer Co. in Germany, he knew of five other importers of merchandise described as anodized aluminum chain of this general type; that, based upon a tabulation of these sales, it was his determination that 5 to 10 thousand meters represented the usual wholesale quantities in which this merchandise was sold. Mr. Greenberg testified that he was unable to remember if the importer involved in this case, E. W. Goldstein Co., Inc., imported any types or styles of aluminum chain from Walter Fischer other than that contained in the entry under consideration.

Defendant's illustrative exhibits A through G were received in evidence and identified by the witness as some of the styles and types of aluminum chain manufactured by Walter Fischer and imported by companies other than the plaintiff herein. All but one such exhibit

had a tag with what the witness stated was a type or style identification number used by Walter Fischer. None was tagged as SP 60 or 06/33 chain. Mr. Greenberg further testified that the exhibits represented the styles and types of merchandise he had considered in determining the usual wholesale quantity for the instant importation.

On cross-examination, the witness stated that his records respecting quantities of imports of aluminum chain manufactured by Walter Fischer included styles and sizes other than those in exhibits A to G.

On redirect examination, he explained that by aluminum chain he meant those used for jewelry applications.

In rebuttal, the plaintiff called Mr. Edmond W. Goldstein, president of the plaintiff corporation. He testified that he was an importer of stones, chains, pearls, and imitation pearls which he sold to the jewelry manufacturing trade. He identified exhibit A, which was attached to plaintiff's exhibit 1, as the SP 60 anodized aluminum chain imported by his company. He further identified plaintiff's collective illustrative exhibit 2 as articles of jewelry made with the imported SP 60 chain. Finally, he testified that he would not accept defendant's illustrative exhibits A through G as orders for the merchandise at bar.

On cross-examination, he acknowledged that defendant's illustrative exhibits are possibly susceptible to use by jewelry manufacturers, although none of his customers use it.

Another stipulation was entered into by the parties at trial which further narrowed the area of dispute in this case. It was agreed that, if the court should hold that types and styles of chain other than that involved herein may not be taken into consideration in determining the usual wholesale quantity, then the claimed quantity of 100,000 meters represents the usual wholesale quantity, and further, that the entered value of $2.75 per 100 meters represents the freely offered price for this merchandise in that quantity (R.6–8).

It has long been recognized that parties in a reappraisement proceeding may stipulate on ultimate facts and thereby focus the court's attention on the real matters in controversy, *Pacific Trading Co.* v. *United States*, 19 CCPA 361, 363–365, T.D. 45508; *Brooks Paper Company* v. *United States*, 40 CCPA 38, 47, C.A.D. 495. Thus, the issue in this case, as stated by both parties in their briefs, is whether it was proper for the appraiser in determining the "usual wholesale quantities" to include information respecting sales of various styles and sizes of aluminum chain, other than the particular type involved in this entry, which were produced and sold by the same manufacturer. The pertinent provisions of the law are set forth as follows:

[Sec. 402] (b) EXPORT VALUE.—For the purposes of this section, the export value of imported merchandise shall be the price, at the

time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

\* \* \* \* \* \* \*

[Sec. 402] (f) DEFINITIONS.—For purposes of this section—

\* \* \* \* \* \* \*

(4) The term "such or similar merchandise" means merchandise in the first of the following categories in respect of which export value, United States value, or constructed value, as the case may be, can be satisfactorily determined:

(A) The merchandise undergoing appraisement and other merchandise which is identical in physical characteristics with, and was produced in the same country by the same person as, the merchandise undergoing appraisement.

(B) Merchandise which is identical in physical characteristics with, and was produced by another person in the same country as, the merchandise undergoing appraisement.

(C) Merchandise (i) produced in the same country and by the same person as the merchandise undergoing appraisement, (ii) like the merchandise undergoing appraisement in component material or materials and in the purposes for which used, and (iii) approximately equal in commercial value to the merchandise undergoing appraisement.

(D) Merchandise which satisfied all the requirements of subdivision (C) except that it was produced by another person.

(5) The term "usual wholesale quantities," in any case in which the merchandise in respect of which value is being determined is sold in the market under consideration at different prices for different quantities, means the quantities in which such merchandise is there sold at the price or prices for one quantity in an aggregate volume which is greater than the aggregate volume sold at the price or prices for any other quantity.

Counsel for the plaintiff argues that section 402(f)(4) of the statute directs the value determination in this case to the freely offered, usual wholesale quantity price for the involved chain only and that inquiry into the sales of other sizes and styles of chain is irrelevant.

However, Government counsel contends, the stipulated facts notwithstanding, that the precise question of law raised in these proceedings was passed upon by our appellate court in *Indussa Corp.* v. *United States*, 47 CCPA 93, C.A.D. 736. It is the effect of that decision on the instant appeal which is at the heart of the dispute before this court.

The merchandise before the court in the *Indussa* case, *supra*, consisted of a variety of enameled cast iron household ware. They were appraised at *per se* unit prices, less 27 per centum discount, plus 9 per centum Belgian home sales tax and packing. It was agreed that foreign value, as defined in section 402(c) under the "old law," [2] was the proper basis of appraisement. The evidence established that, in addition to the imported items (frying pans, sauce pans, and oval casseroles), the exporter manufactured and sold pots, dutch caldrons, serving dishes, and other articles for cooking and serving food. All were made of cast iron coated with an enamel veneer. It was also established that in sales for home consumption discounts were granted from pricelists based upon the total weight or value of the items purchased, regardless of which items they might be. The appellate term of this court reversed the lower court and held that appellant's claim of a 40 per centum discount for the imported items was not shown to be applicable to the items when sold by the piece.

Before the court of appeals, the appellant argued that, since over 75 percent of the manufacturer's wholesale transactions were in lots of 500 kilograms or more, the usual wholesale quantities are lots sold by the *per se* unit price, less a 40 per centum discount. The appellate tribunal, in sustaining appellant's claim and reversing the decision below, said:

> We believe that the Congress intended the statute to mean that when it has been established that certain merchandise of the manufacturer is sufficiently related, all of the foreign sales for home consumption of those related articles when sold in lots of assorted items will provide a basis for establishing the "usual wholesale quantities" under § 402(c).

In referring to the word "such" as appears in section 402(c), *supra*, the court concluded:

> The word "such" as used in that section has been construed by our predecessor court to mean "identical." *United States* v. *Meadows Wye & Co., Inc. (F. A. MacCluer, Inc.)*, 15 Ct. Cust. Appls. 451, T.D. 42643. However, we believe that this definition includes items of identical manufacture varying only slightly in size or in size and shape, when used for the same purpose and sold by the manufacturer, *in his usual course of business*, in assorted lots, when the question of determining the "usual wholesale quantities" arises. * * * [Emphasis the appellate court's.]

It seems to this court that there exists important distinctions between the situation confronting the court in the *Indussa* case, *supra*, and that which is presented here. First of all, it was shown in the *Indussa* case, *supra*, that the kitchen ware items involved were related in what may be termed a commercial sense. That is, the manufacturer-seller sold them to the wholesale market pursuant to an established

---

[2] Section 402a(c), as amended.

pricelist from which discounts based on the weight or value of each purchase were uniformly offered on the entire line of items. The record in the instant case contains no such evidence of a similar commercial market. Defendant's witness Greenberg merely testified to the existence of wholesale transactions between the manufacturer-exporter and various other United States importers. While these sales related to other styles and sizes of anodized aluminum chain, there was no indication that they were made in assorted lots or that the discounted price was based on the weight or value of these chains regardless of the style or size being offered. Quite to the contrary, the tabulation of sales in plaintiff's exhibit 1 suggests a discount offering based on the quantity of pieces of an individual style or size of chain.

Moreover, the appellate court in the *Indussa* case, *supra*, observed that the discount practice followed by the manufacturer-seller therein was both logical and reasonable considering the line of products involved. That is, a wholesaler would normally deal in a "line" of kitchen ware items rather than stock just frying pans or dishes to the exclusion of others. No such inference concerning the merchandising of the various styles of chain can necessarily be implied from the facts in this case. Plaintiff's witness Goldstein unequivocally stated that both he and his customers were interested only in the type of chain represented by plaintiff's exhibit A, attached to plaintiff's exhibit 1. It may be that other importers purchase several styles of chain but this does not allow the inference that the normal wholesale discount market is tied into assorted lot sales, or that quantity discount sales of individual styles and sizes of chain is not, as the record evidence tends to indicate, an ordinary course of dealing.

The items involved in the *Indussa* situation, *supra*, were related in the following physical sense as well: They were all made of cast iron and coated with enamel; they were approximately the same size; and they served the same end purpose—cooking and serving food, differing in shape only to adapt them to specific cooking and serving functions. The various samples of chain before me in this proceeding differ noticeably in at least two of these respects. Although they may all be manufactures of anodized aluminum, some have received valuable gold coloring additives, while others are imported in the natural state of the aluminum metal. More importantly, the comparative sizes of the chains are hardly approximate. The smallest chain in defendant's exhibits A to G appears to be about twice the link thickness of the chain representative of the imported merchandise as contained in plaintiff's exhibit 1. The other samples of chain in defendant's exhibits range to many times the thickness and weight of that covered by this appeal.

Absent the existence of a factual situation paralleling that present in the *Indussa* case, plaintiff's burden of proof on the issue of "usual wholesale quantities," as defined in section 402(f)(5), *supra,* has been sustained by a showing of the quantity in which the greatest aggregate volume of such merchandise is sold. "Such merchandise," on the other hand, is limited in section 402(f)(4)(A), among other things, to merchandise possessing identical physical characteristics as that undergoing appraisement. The merchandise undergoing appraisement here and other merchandise produced by the same manufacturer and used by the appraiser in his determination of a statutory value have the same component material, namely, anodized aluminum. While component material is an important physical characteristic, it is by no means the only one. Color and size, respects in which the imported merchandise and that used by the appraiser differ, are two physical characteristics that help distinguish one thing from another. The phrase "identical in physical characteristics" may not be an absolute of rigid detail but, based on the record made in this case, it prohibits the lumping together of the various sizes and types of merchandise such as was done by the appraiser here.

For the foregoing reasons, I find the facts to be:

1. That the merchandise covered by this appeal for reappraisement consists of SP 60 anodized aluminum chain (silver), exported by Walter Fischer, from Idar-Oberstein, Germany, in August 1960.

2. That said merchandise is not enumerated in the final list, T.D. 54521, as issued by the Secretary of the Treasury pursuant to the Customs Simplification Act of 1956, T.D. 54165.

3. That said merchandise was appraised at $3.01 per 100 meters on the basis of export value, as defined in section 402(b), Tariff Act of 1930, as so amended by the Customs Simplification Act of 1956.

4. That, at the time of exportation, said merchandise was freely sold, in the ordinary course of trade, in the principal markets of Germany, for exportation to the United States at different prices for different quantities.

5. That, at the time of exportation of the merchandise undergoing appraisement, the quantities in which it was sold in the principal market, at a price for one quantity in an aggregate volume which was greater than the aggregate volume sold at the price or prices for any other quantity, were 100,000 meters.

6. That, at the time of exportation of the items in question, the price at which such or similar merchandise was freely sold in the principal market of Idar-Oberstein, Germany, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, including the cost of all containers and coverings of

whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States, was $2.75 per 100 meters.

I, therefore, conclude as to matters of law:

1. That export value, as defined in section 402(b), Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, is the proper basis for appraisement of the merchandise covered by this appeal for reappraisement.

2. That said statutory value is the invoice price of $2.75 per 100 meters.

Judgment will be entered accordingly.